COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
DARREN J. ROBBINS (168593)
DAVID C. WALTON (167268)
CATHERINE J. KOWALEWSKI (216665)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@csgrr.com
davew@csgrr.com
katek@csgrr.com

HOLZER, HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mfistel@holzerlaw.com

DYER & BERENS LLP
JEFFREY A. BERENS
682 Grant Street
Denver, CO 80203-3507
Telephone: 303/861-1764
303/395-0393 (fax)
jeff@dyerberens.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| RENE PAROLA, Individually and On Behalf of All Others Similarly Situated, | VIA FAX No. SACV09-00386 SVW (JTLx) |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, ALLIANZ GLOBAL INVESTORS FUND MANAGEMENT LLC, WILLIAM H. GROSS, MOHAMED A. EL-ERIAN, BRIAN S. SHLISSEL, HANS W. KERTESS, LAWRENCE G. ALTADONNA, PAUL BELICA, ROBERT E. CONNOR, R. PETER SULLIVAN III, JOHN C. MANEY, WILLIAM B. OGDEN IV and MARK V. McCRAY, | |
| Defendants. | DEMAND FOR JURY TRIAL |

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act"). The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5. The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

2.      Venue is proper here pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.   Pacific Investment Management Company LLC has a substantial presence in California and is headquartered in Newport Beach, California. Many of the acts and transactions giving rise to the violations of law complained of occurred here.

3.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## INTRODUCTION

4.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired the common shares of certain mutual funds offered by Allianz Global Investors Fund Management LLC ("Allianz Global"), including the common shares of the PIMCO California Municipal Income Fund II (the "PCK Fund"), PIMCO Municipal Income Fund II (the "PML Fund"), PIMCO Municipal Income Fund III (the "PMX Fund"), PIMCO New York Municipal Income Fund III (the "PYN Fund") and PIMCO California Municipal Income Fund III (the "PZC Fund") (collectively referred to as the "Funds") between May 22, 2007 and December 1, 2008 for the PCK and PML Funds, inclusive (the "PIMCO II Class Period") and between June 6, 2007 and December 1, 2008 for the PMX, PYN and PZC Funds, inclusive (the "PIMCO III Class Period"), against the Funds' investment manager, Allianz Global (the "Investment Manager") and the Funds' sub-adviser, Pacific Investment Management Company LLC ("PIMCO") (the "Sub-Adviser"), and certain

1  of its officers and/or trustees for violations of the Securities Exchange Act of 1934

2  ("1934 Act").

3      5.     The PCK Fund is a non-diversified, closed-end management investment

4  company. The PCK Fund invests substantially all of its assets in municipal bonds, the

5  interest from which is exempt from federal and California state income tax and also

6  invests in residual interest municipal bonds/residual interest tax-exempt bonds.

7      6.     The PML Fund is a non-diversified, closed-end management investment

8  company. The PML Fund invests substantially all of its assets in a portfolio of

9  municipal bonds, the interest from which is exempt from federal income tax and also

10  invests in residual interest municipal bonds/residual interest tax-exempt bonds.

11      7.     The PMX Fund is a non-diversified, closed-end management investment

12  company.  The PMX Fund invests substantially all of its assets in a portfolio of

13  municipal bonds, the interest from which is exempt from federal income taxes.  The

14  PMX Fund invests in residual interest municipal bonds ("RIBs") and residual interest

15  tax-exempt bonds ("RITEs") (inverse floaters), whose interest rates bear an inverse

16  relationship to the interest rate on another security or the value of an index. The PMX

17  Fund may purchase and write or sell put and call options on securities.

18      8.     The PYN Fund is a non-diversified, closed-end management investment

19  company. The PYN Fund invests substantially all of its assets in municipal bonds,

20  which pay interest that is exempt from federal, New York state and New York City

21  income taxes.  The PYN Fund invests in RIBs and RITEs (inverse floaters), whose

22  interest rates bear an inverse relationship to the interest rate on another security or the

23  value of an index. The PYN Fund may purchase and write or sell put and call options

24  on securities.

25      9.     The PZC Fund is a non-diversified, closed-end management investment

26  company.  The PZC Fund invests substantially all of its assets in municipal bonds,

27  which pay interest that is exempt from federal and California state income taxes.  Its

28  portfolio includes California municipal bonds and notes, other municipal bonds and

- 2 -

1   notes, California variable-rate notes and other variable-rate notes. The PZC Fund may

2   purchase and write or sell put and call options on securities. The PZC Fund invests in

3   RIBS and RITEs (inverse floaters), whose interest rates bear an inverse relationship to

4   the interest rate on another security or the value of an index.

5   　　　10.　　PIMCO is a global investment management firm. PIMCO primarily

6   provides its services to pension and profit sharing plans. It also manages accounts for

7   high-net-worth individuals, banking or thrift institutions, investment companies,

8   pooled investment vehicles, charitable organizations, corporations, state or municipal

9   government entities, and foreign clients. PIMCO manages separate client focused

10  fixed income portfolios and mutual funds. It invests in the fixed income markets

11  across the globe.

12  　　　11.　　Large portions of the Funds' portfolios were invested in the municipal

13  bond market. Investors were not informed of the level of risk associated with the

14  Funds' exposure to auction rate securities and the attendant Funds' liquidity risk.

15  Investors were further not informed that the Funds lacked adequate internal controls to

16  ensure that the Funds would remain in compliance with their restrictions and

17  limitations related to their investment portfolios and strategies and to ensure that the

18  Funds maintained proper leveraging practices to minimize the risks associated with

19  the Funds' portfolios.

20  　　　12.　　During the PIMCO II Class Period and/or PIMCO III Class Period,

21  defendants issued materially false and misleading statements regarding the Funds'

22  portfolios and risks. As a result of defendants' false statements, the Funds' shares

23  traded at artificially inflated prices during the PIMCO II Class Period and/or PIMCO

24  III Class Period.

25  　　　13.　　Beginning in September 2008 and continuing through November 2008,

26  the Funds began to acknowledge the serious deterioration in the Funds' portfolios. As

27  a result of these disclosures, the price of the Funds' shares collapsed. Prior to any

28  negative disclosures, each of the Funds traded within a narrow trading band. For

- 3 -

1  example, the PMX Fund traded within the $14 and $16 per share range from January
2  2007 through August 2008.  In contrast, by December 2008, the PMX Fund was
3  trading in the $6.50 per share range.  Note the following chart:



14.    The true facts, which were known by the defendants but concealed from
the investing public during the PIMCO II Class Period and/or PIMCO III Class
Period, were as follows:

(a)    The Funds lacked effective controls and hedges to minimize the
risk of loss and risk of liquidity from auction rate securities ("ARS") which affected a
large part of their portfolios;

(b)    The Funds lacked effective internal controls to ensure that the
Funds would remain in compliance with restrictions and limitations related to their
investment portfolios and strategies;

1           (c)    The extent of the Funds' liquidity risk due to the illiquid nature of

2 a large portion of the Funds' portfolios, including ARS, was omitted; and

3           (d)    The extent of the Funds' risk exposure to ARS was misstated.

4                         **THE PARTIES**

5        15.    Plaintiff Rene Parola purchased PCK Fund shares as described in the

6 attached certification and was damaged thereby.

7        16.    Defendant PIMCO is, and at all relevant times, was, Sub-Adviser to the

8 Funds. PIMCO is one of the world's leading fixed-income managers. PIMCO offers

9 separate account management services primarily for employee benefit plans,

10 endowments and foundations.

11        17.    Defendant Allianz Global serves as the Funds' Investment Manager and

12 is the exclusive distributor of the Funds. Allianz Global's line of business is

13 investment advisory services. Allianz Global is an indirect, wholly-owned subsidiary

14 of Allianz Global Investors of America L.P. The Investment Manager received an

15 annual fee, payable monthly, of 0.65% of each Funds' average daily net assets, more

16 than $15 million per year.

17        18.    Defendant William H. Gross ("Gross") is, and at all relevant times was,

18 Founder and Co-Chief Investment Officer of PIMCO.

19        19.    Defendant Mohamed A. El-Erian ("El-Erian") is, and at all relevant times

20 was, Co-CEO of PIMCO.

21        20.    Defendant Hans W. Kertess ("Kertess") is, and at all relevant times was,

22 Chairman of the Board of Trustees of the Funds.

23        21.    Defendant Brian S. Shlissel ("Shlissel") is, and at all relevant times was,

24 President, CEO and a trustee of the Funds. Additionally, Shlissel is Executive Vice

25 President of Allianz Global.

26        22.    Defendant Lawrence G. Altadonna ("Altadonna") is, and at all relevant

27 times was, Principal Financial and Accounting Officer and Treasurer of the Funds.

28 Additionally, defendant Altadonna is Senior Vice President of Allianz Global.

23.   Defendant Paul Belica ("Belica") is, and at all relevant times was, a trustee of the Funds.

24.   Defendant R. Peter Sullivan III ("Sullivan") is, and at all relevant times was, a trustee of the Funds.

25.   Defendant John C. Maney ("Maney) is, and at all relevant times was, a trustee of the Funds.  Additionally, Maney is Chief Operating Officer of Allianz Global.

26.   Defendant William B. Ogden IV ("Ogden") is, and at all relevant times was, a trustee of the Funds.

27.   Defendant Robert E. Connor ("Connor") is, and at all relevant times was, a trustee of the Funds.

28.   Defendant Mark V. McCray ("McCray") was, at all relevant times, portfolio manager of the Funds.

29.   The defendants referenced above in ¶¶18-28 are referred to herein as the "Individual Defendants."

## BACKGROUND

30.   The equity of the Funds was comprised of common shares and preferred shares, with common shareholders having more equity than preferred shareholders. The dividends paid to the preferred shares were set by auctions.  Preferred shares had dividend priority over common shares, and there were limitations of the ability of the Funds to pay dividends on common shares where ratios were not met.  The failure of auctions on the preferred shares could thereby adversely affect the Funds' ability to pay dividends on the common shares, which was the key reason the investors purchased and held the common shares.  Unbeknownst to investors, the auction process was fraught with uncertainty and risk.

31.   ARS were first offered for sale in U.S. financial markets in the early 1980s.  By the end of 2007, there were over $300 billion of ARS outstanding.  Many different types of issuers have issued ARS – for example, closed-end funds,

1  corporations, municipal authorities and student loan organizations. The following
2  types of products may be issued as ARS: shares of closed-end funds, including
3  taxable and tax-exempt preferred securities; corporate securities eligible for the
4  dividends-received deduction; municipal bonds; asset-backed securities, including
5  taxable and tax-exempt bonds; and hybrid capital products, which may be structured
6  as private placements for sale to institutional investors.

7      32.    ARS have generally been issued as either bonds or preferred stock and
8  are designed to serve as money market-type instruments. They are purchased and
9  sold, at established intervals, through an auction-type mechanism, but have long-term
10  maturities, or no maturity at all. In the auctions, ARS are purchased and sold at par.
11  ARS have also been called "Auction Market Preferred Stock," "Variable Rate
12  Preferred Securities," "Money Market Preferred Securities" and "Periodic Auction
13  Rate Securities."

14      33.    The interest or dividend rate of ARS is reset at these established intervals
15  based on an auction in which investors who already hold the security (called
16  "holders") indicate their interest in continuing to hold, or in purchasing or selling, the
17  security at rates that they specify to broker-dealers who have been appointed to
18  participate in the auction. The dates on which the auctions take place (the "auction
19  dates"), and the interval between the auction dates (the "auction period"), vary
20  depending on the security. The auctions commonly are every seven days, twenty-
21  eight days, thirty-five days or forty-nine days, but there are also some securities for
22  which the auctions occur daily and others for which auctions occur at longer
23  intervals – for example, every six months or once over a multi-year period.

24      34.    The auction procedures permit three types of auction orders to be placed:

25      (a)    **Hold order**: A holder may indicate to the auction dealer the
26  amount of the security that he or she wishes to continue to hold without regard to the
27  clearing rate that sets in the auction. Generally, auction procedures call this type of
28  order a "hold" order. Auction dealers may also refer to it as a "roll" order.

-7-

(b)   **Bid**: A holder may indicate to the auction dealer the amount of the security that he or she desires to continue to hold, or a prospective holder may indicate to the auction dealer that he or she wishes to acquire a specified amount of the security, at or above a desired interest or dividend rate that the holder or prospective holder specifies.  Generally, the auction procedures call this type of order a "bid," and a person who places a bid a "bidder." If the clearing rate sets below the interest or dividend rate that the holder or prospective holder specifies in his or her bid:

(i)   the holder will be required to sell the securities subject to his or her bid in the auction;

(ii)   the prospective holder will not acquire the securities subject to his or her bid in the auction. Auction dealers refer to bids by prospective holders as "buy" orders, and bids by holders as "roll-at-rate" orders.

(c)   **Sell order**: If the holder desires to sell a specified amount of the security in the auction without regard to the clearing rate that sets in the auction, he or she will place a "sell" order with the auction dealer for that amount of the security. The total amount of securities that are the subject of sell orders and roll-at-rate orders is the total amount of securities that are "exposed for sale" in the auction.

35.   If a holder of securities does not place an order (hold, bid or sell) with respect to the securities he or she holds, the auction procedures generally provide that the holder will be deemed to have elected to continue to hold the securities regardless of the clearing rate. Such securities are called "deemed hold" securities. However, auction procedures may specify that, with respect to auctions in which the issuer is changing the auction period, the holders of "deemed hold" securities will be deemed to have elected to sell their securities in the auction.

36.   After the submission deadline for an auction has passed, the auction agent assembles all the orders submitted to it by any auction dealers that are signed up to participate in the auction. The auction agent then determines the clearing rate. The

1  clearing rate is the lowest rate bid sufficient to cover all the securities that are exposed
2  for sale in the auction.

3      37.    To illustrate, the following is a hypothetical example of how the auction
4  procedures generally are used in determining the clearing rate. The example assumes
5  that there are 1,000 shares of a security outstanding and that the following orders are
6  received by the auction agent for an auction of the security:

| Roll-at-Rate Orders (Holders) | Sell Orders (Holders) | Buy Orders (Prospective Holders) |
|---|---|---|
| 20 Shares at 2.90% | 100 Shares | 40 Shares at 2.95% |
| 60 Shares at 3.02% | 100 Shares | 60 Shares at 3.00% |
| 120 Shares at 3.05% | 200 Shares | 100 Shares at 3.05% |
| 200 Shares at 3.10% | **Total = 400 Shares** | 100 Shares at 3.10% |
| 200 Shares at 3.12% | | 100 Shares at 3.11% |
| **Total = 600 Shares** | | 100 Shares at 3.14% |
| | | 200 Shares at 3.15% |
| | | **Total = 700 Shares** |

14  38.    In the above example, 1,000 shares of the security – the entire issue
15 size – have been exposed for sale in the auction because there are sell orders for 400
16 shares and roll-at-rate orders for 600 shares. There are no hold orders or "deemed
17 hold" securities in this example. The following chart illustrates how the clearing rate
18 is established based on the above assumed orders:

| Number of Shares in Order | Rate Bid | Cumulative Shares | Winning/Losing |
|---|---|---|---|
| 20 | 2.90% | 20 | Winning |
| 40 | 2.95% | 60 | Winning |
| 60 | 3.00% | 120 | Winning |
| 60 | 3.02% | 180 | |
| 100 | 3.05% | 280 | Winning |
| 120 | 3.05% | 400 | Winning |
| 200 | 3.10% | 600 | Winning |
| 100 | 3.10% | 700 | Winning |
| 100 | 3.11% | 800 | Winning |
| **200** | **3.12%** | **1000** | **Winning** |
| 100 | 3.14% | | Losing |
| 200 | 3.15% | | Losing |

39.     The customer who placed the roll-at-rate order for 200 shares at 3.12% (*see* bolded order in the above chart) clears the auction of all 1,000 shares that are exposed for sale. The rate of 3.12% is the clearing rate that will apply to all the shares of the security until the next auction date. The holders and prospective holders in the above example who submitted bids at or below 3.12% – that is, the winning bids – will either retain their shares (in the case of the holders' bids) or be awarded the number of shares indicated in their bids (in the case of the prospective holders' bids). The prospective holders who placed bids for 100 shares at 3.14% and 200 shares at 3.15%, respectively, will not be awarded any shares in the auction – these are losing bids.

40.     Auction dealers that sign up for auctions submit all orders to the auction agent by a deadline called the "submission deadline."  Customers submit all auction orders by an earlier deadline (that is, prior to the submission deadline). This earlier deadline is called the "internal deadline."

41.     If a bid by a holder exceeds a certain rate called the "maximum rate," the bid is treated as a sell order and a bid by a prospective holder that exceeded the maximum rate is not considered. Generally, the maximum rate is an above market rate determined by a formula.  For example, the maximum rate could be based upon a multiple of the London Interbank Offered Rate ("LIBOR") or an applicable U.S. Treasury Index Rate.  Alternatively, the maximum rate may be a fixed percentage.

42.     If a bid by a holder or a prospective holder specifies a rate lower than a certain rate called the "minimum rate," then the bid is treated as though it specifies the minimum rate.   The minimum rate is generally a materially below-market rate determined by a formula.  For example, the minimum rate could be based on 60% of LIBOR or an applicable U.S. Treasury Index Rate.

43.     In the event the amount of the security in an auction that is the subject of bids from prospective holders (that is, buy orders) is less than the amount of the security that is the subject of sell orders submitted into the auction, the maximum rate

- 10 -

1   would apply to the entire outstanding amount of the security until the next auction
2   date. This is called "auction failure."

3       44.   In the event of an auction failure, ARS holders are not able to sell all, and
4   might not be able to sell any, securities in the auction. Specifically, if no buy orders
5   are placed in an auction, holders are not able to sell any of their securities in the
6   auction. To the extent any buy orders are placed in a failed auction, the auction agent
7   fills holders' sell orders on a pro rata basis.

8       45.   During 2007, auction failures would have been occurring with increasing
9   frequency had it not been for intervention by issuers of the ARS. These interventions
10  involved issuers bidding on their own account to prevent failures. These interventions
11  also concealed a dramatically weakening market for ARS. Once the interventions
12  ceased, there was bound to be a collapse of the ARS market. Yet the increasing
13  interventions were concealed from investors, including those in the Funds.

14      46.   Once the interventions became public and failures became common,
15  defendants continued to conceal the impact of the failures on common shareowners in
16  the Funds. Ultimately, the problems in the ARS market cause the Funds to halt
17  dividend payments completely to common shareowners, causing the collapse of the
18  Funds' prices.

19      **DEFENDANTS' FALSE AND MISLEADING**
    **STATEMENTS DURING THE PIMCO II CLASS PERIOD**
20      **AND/OR PIMCO III CLASS PERIOD**

21      47.   On May 22, 2007, PIMCO filed Forms N-CSR[1] for the PML and PCK
22  Funds for the six-month period ending November 30, 2006. In the Semi-Annual
23  Reports, the letter to the shareholders stated in part:

24      We are pleased to provide you with the semi-annual report for
25      PIMCO Municipal Income Fund II, PIMCO California Municipal

26  ―――――――――――――――

27  [1]   SEC Form N-CSR is a Certified Shareholder Report of Registered Management
    Investment Companies. It is filed on a semi-annual basis.

28

1    Income Fund II and PIMCO New York Municipal Income Fund II
2    (collectively, the "Funds") for the six months ended November 30, 2006.

3        During the period, the bond market rallied as the economy slowed
4    and expectations grew that the Federal Reserve (the "Fed") might begin
5    easing. In fact, the Fed left rates unchanged at 5.25% at its last four
6    meetings. This came after 17 consecutive increases in short-term interest
7    rates over two years. The apparent end of the Fed's tightening cycle
8    proved to be a positive for the Funds' performance during the reporting
9    period.

10                      \*     \*     \*

11        Together with Allianz Global Investors Fund Management LLC,
12    the Funds' investment manager, and Pacific Investment Management
13    Company LLC ("PIMCO"), the Funds' sub-adviser, we thank you for
14    investing with us.

15        48.    In the Semi-Annual Report, the PML Fund reported net asset value
16    ("NAV") of $896 million or $15.25 per share and investment income of $31 million
17    for the period. The PCK Fund reported NAV of $461 million or $15.12 per share and
18    net investment income of $16 million for the period.

19        49.    The PML and PCK Funds' Semi-Annual Reports further stated in
20    pertinent part:

21        The Funds are subject to certain limitations and restrictions while
22    Preferred Shares are outstanding.    Failure to comply with these
23    limitations and restrictions could preclude the Funds from declaring any
24    dividends or distributions to common shareholders or repurchasing
25    common shares and/or triggering the mandatory redemption of Preferred
26    Shares at their liquidation value.

27

28

1       Preferred Shares, which are entitled to one vote per share,
2       generally vote separately as a class to elect two Trustees and on any
3       matters affecting the rights of the Preferred Shares.

4       50.    However, the Forms N-CSR concealed how tenuous the auction process
5 for the preferred shares was. In fact, the document never refers to ARS nor the role
6 many issuers played in their own auctions, such that the actual risk of discontinuing
7 dividend payments to common shareholders was concealed.

8       51.    On June 6, 2007, PIMCO filed Forms N-CSR for the PMX, PZC and
9 PYN Funds for the six-month period ending March 31, 2007. In the Semi-Annual
10 Reports, the letter to the shareholders stated in part:

11       We are pleased to provide you with the semi-annual report for
12       PIMCO Municipal Income Fund III, PIMCO California Municipal
13       Income Fund III and PIMCO New York Municipal Income Fund III (the
14       "Funds") for the six-month period ended March 31, 2007.

15       The US bond market delivered stable, positive returns in the
16       period as economic growth moderated and a correction in the US
17       housing market caused some weakness for bonds. The Lehman
18       Municipal Bond Index returned 1.93% for the period, providing a
19       competitive return on a tax-adjusted basis to the broad market return of
20       2.76% logged by the Lehman Aggregate Bond Index. The Federal
21       Reserve (the "Fed") left the Federal Funds rate unchanged at 5.25%
22       through the period as inflation levels continued to track somewhat higher
23       than the central bank's stated comfort level.

24             *    *    *

25       Together with Allianz Global Investors Fund Management LLC,
26       the Funds' investment manager, and Pacific Investment Management
27       Company LLC, the Funds' sub-adviser, we thank you for investing with
28       us.

52.    The PMX, PZC and PYN Funds' Semi-Annual Reports further stated in part:

> The Funds are subject to certain limitations and restrictions while Preferred Shares are outstanding.    Failure to comply with these limitations and restrictions could preclude the Funds from declaring any dividends or distributions to common shareholders or repurchasing common shares and/or could trigger the mandatory redemption of Preferred Shares at their liquidation value.

53.    On August 6, 2007, the PML and PCK Funds filed their Forms N-CSR for the fiscal year ending May 31, 2007.  In the Annual Report, the PML Fund reported NAV of $886 million or $15.05 per share and net investment income of $65 million for the year.  The PCK Fund reported NAV of $455 million or $14.89 per share and net investment income of $33 million for the year.  The letter to shareholders contained in the Annual Reports provided in part:

> We are pleased to provide you with the annual report for PIMCO Municipal Income Fund II, PIMCO California Municipal Income Fund II and PIMCO New York Municipal Income Fund II (collectively, the "Funds") for the fiscal year ended May 31, 2007.

> The U.S. bond market delivered stable, positive returns during the period as economic growth moderated, although a correction in the US housing market caused some weakness for bonds. The Federal Reserve (the "Fed") raised the Federal Funds rate to 5.25% at the beginning of the period and has held the key rate at that level for nearly one year. Inflation continued to track somewhat higher than the central bank's stated comfort level.

> \*       \*       \*

> Together with Allianz Global Investors Fund Management LLC, the Funds' investment manager, and Pacific Investment Management

1    Company LLC ("PIMCO"), the Funds' sub-adviser, we thank you for

2    investing with us.

3        54.    The PCL and PCK Funds' Annual Reports further provided in pertinent

4    part the following concerning the Funds' performance and outlook for the period:

5        •    For the fiscal year ended May 31, 2007, PIMCO California

6            Municipal Income Fund II returned 8.06% on net asset value

7            (NAV) and 15.35% on market price, compared to 5.88% and

8            10.15%, respectively for the Lipper California Municipal Debt

9            Funds (Leveraged) average.

10                                    *        *        *

11       •    For the fiscal year ended May 31, 2007, PIMCO Municipal

12           Income Fund II returned 8.02% on net asset value (NAV) and

13           12.64% on market price, compared to 5.92% and 10.37%,

14           respectively for the Lipper Analytical General Municipal Debt

15           Funds (Leveraged) average.

16       55.    On December 7, 2007, PIMCO filed Forms N-CSR for the PZC, PMX

17   and PYN Funds for the year ending September 30, 2007. In the Annual Report, the

18   PMX Fund reported NAV of $457 million or $14.53 per share and net investment

19   income of $36 million for the year. The PZC Fund reported NAV of $311 million or

20   $14.48 per share and net investment income of $23 million for the year. The PYN

21   Fund reported NAV of $80 million or $14.57 per share and net investment income of

22   $5 million for the year. The letter to shareholders contained in the Annual Reports

23   provided in part:

24           We are pleased to provide you with the annual report for the

25           PIMCO Municipal Income Fund III, PIMCO California Municipal

26           Income Fund III and PIMCO New York Municipal Income Fund III (the

27           ''Funds'') for the fiscal year ended September 30, 2007.

28

- 15 -

The U.S. bond market delivered modest returns for the period as economic growth continued to moderate and weakness in the U.S. housing and mortgage markets added to volatility. The Lehman Municipal Bond Index returned 3.09% for the period, providing a competitive return on a tax-adjusted basis to the broad market return of 5.14% for the Lehman Aggregate Bond Index. The Federal Reserve lowered the Federal Funds rate during the period in a move to add liquidity to markets that had become constrained due to weakness in subprime mortgages.

\*     \*     \*

Together with Allianz Global Investors Fund Management LLC, the Funds' investment manager, and Pacific Investment Management Company LLC, the Funds' sub-adviser, we thank you for investing with us.

We remain dedicated to serving your investment needs.

56.     The PZC, PMX and PYN Funds' Annual Reports also stated:

- For the fiscal year ended September 30, 2007, PIMCO Municipal Income Fund III returned 3.17% on net asset value and 1.38% on market price, compared with 1.28% and (0.07)%, respectively, for the Lipper Analytical General Municipal Debt Funds (Leveraged) average.

\*     \*     \*

- For the fiscal year ended September 30, 2007, PIMCO California Municipal Income Fund III returned 3.54% on net asset value and (11.38)% on market price, compared with 1.57% and (2.14)%, respectively, for the Lipper Analytical California.

\*     \*     \*

- For the fiscal year ended September 30, 2007, PIMCO New York Municipal Income Fund III returned 1.71% on net asset value and (13.12)% on market price, compared with 1.63% and (0.84)%, respectively, for the Lipper Analytical New York Municipal Debt Funds average.

57.     On February 6, 2008, the PML and PCK Funds filed their Forms N-CSR for the six-month period ending November 30, 2007. In the Semi-Annual Report, the PML Fund reported an NAV of $847 million or $14.36 per share and net investment income of $32 million for the period. The PCK Fund reported an NAV of $424 million or $13.84 per share and net investment income of $16 million for the period. The Semi-Annual Reports further provided substantially similar statements concerning the PML and PCK Funds' performances and outlooks. The Semi-Annual Reports contained nearly identical disclosures about Auction Preferred Shares, although by this time auctions were increasingly failing and would soon turn into front page news.

58.     On June 9, 2008, PIMCO filed Forms N-CSR for the PMX, PZC and PYN Funds for the six-month period ending March 31, 2008. In the Semi-Annual Report, the PMX Fund reported an NAV of $415 million or $13.15 per share and net realized investment income of $20 million for the period. The PZC Fund reported an NAV of $278 million or $12.93 per share and net investment income of $12 million for the period. The PYN Fund reported an NAV of $72 million or $13.17 per share and net investment income of $3 million for the period. The Semi-Annual Reports further provided substantially similar statements concerning the PMX, PZC and PYN Funds' performances and outlooks. The Semi-Annual Report for the PMX Fund stated the following about Auction Preferred Shares:

> Since mid-February 2008, holders of auction-rate preferred shares ("ARPS") issued by the Funds have been directly impacted by an unprecedented lack of liquidity, which has similarly affected ARPS

holders in many of the nation's closed-end funds. Since then, regularly scheduled auctions for ARPS issued by the Funds have consistently "failed" because of insufficient demand (bids to buy shares) to meet the supply (shares offered for sale) at each auction. In a failed auction, ARPS holders cannot sell all, and may not be able to sell any, of their shares tendered for sale. *While repeated auction failures have affected the liquidity for ARPS, they do not constitute a default or alter the credit quality of the ARPS, and ARPS holders have continued to receive dividends at the defined "maximum rate" as the higher of the 30-day "AA" Composite Commercial Paper Rate multiplied by 110% or the Taxable Equivalent of the Short-Term Municipal Obligations Rate-defined as 90% of the quotient of (A) the per annum rate expressed on an interest equivalent basis equal to the Kenny S&P 30-day High Grade Index divided by (B) 1.00 minus the Marginal Tax Rate (expressed a decimal) multiplied by 110% (which is a function of short-term interest rates and typically higher than the rate that would have otherwise been set through a successful auction).*

*These developments with respect to ARPS have not affected the management or investment policies of the Funds, and the Funds' outstanding common shares continue to trade on the NYSE. If the Funds' ARPS auctions continue to fail and the "maximum rate" payable on the ARPS rises as a result of changes in short-term interest rates, returns for the Funds' common shareholders could be adversely affected.*

59.    The prices of PMX, PZC and PYN Funds did not drop appreciably on this news as investors were led to believe that the common dividend would be safe and there was no disclosure as to frequency of issuers bidding on their own securities in the past year and how significant a problem the auction failures were.

60.     On August 7, 2008, PIMCO filed Forms N-CSR for the PML and PCK Funds for the year ending May 31, 2008.  In the Annual Report, the PML Fund reported an NAV of $819 million or $13.86 per share and net investment income of $66 million for the year.  The PCK Fund reported an NAV of $409 million or $13.34 per share and net investment income of $32 million for the year.  The Annual Reports further provided substantially similar statements concerning the PML Fund's performance and outlook as were contained in the PCK Fund's Annual Report.

61.     The letter to shareholders contained in the PML and PCK Funds' Annual Reports stated in part:

> We are pleased to provide you with the annual report for PIMCO Municipal Income Fund II, PIMCO California Municipal Income Fund II and PIMCO New York Municipal Income Fund II (the "Funds") for the fiscal year ended May 31, 2008.
>
> As economic growth slowed and credit conditions tightened during the period, the U.S. bond market delivered positive returns for all but U.S. high yield bonds. The Lehman Municipal Bond Index posted a 3.87% tax-advantaged return. The Federal Reserve (the "Fed") reduced the Federal Funds rate seven times during the reporting period, reducing the benchmark rate on loans between member banks from 5.25% to 2.0%. The Fed also sought other methods to inject liquidity into the economy.
>
> Since February 2008, industry-wide developments in the auction-rate preferred markets have caused auctions for the Funds' auction-rate preferred shares ("ARPS") to fail, as described in Note 5 in the accompanying Notes to Financial Statements. At the time this report is being prepared, it is not possible to predict how and when full or partial liquidity will return, if at all, to the closed-end fund ARPS market. Additional information regarding ARPS, failed auctions and potential

solutions to address the unprecedented lack of liquidity of the ARPS due to recent failed auctions can be accessed on our Web site, www.allianzinvestors.com/arps.

\*     \*     \*

Together with Allianz Global Investors Fund Management LLC, the Funds' investment manager, and Pacific Investment Management Company LLC ("PIMCO"), the Funds' sub-adviser, we thank you for investing with us.

We remain dedicated to serving your investment needs.

62.     In September 2008, the Funds' prices declined significantly due to the impact of the credit crisis and fears about the effect this would have on the Funds. However, prices soon stabilized as the Funds continued to pay dividends and there were no further statements about the auction rate problems.

63.     On November 26, 2008, the PCK Fund issued a release indicating it might be required to delay the payment of the declared November dividend and the declaration of the next scheduled dividend on the Fund's common shares. The release stated in part:

> The Fund is not permitted to pay or declare common share dividends unless the Fund's auction rate preferred shares ("ARPS") have asset coverage of 200% ("200% Level") after payment or declaration of the common share dividend, in accordance with the Investment Company Act of 1940, as amended and the Fund's By-laws. Continued severe market dislocations have caused the value of the Fund's portfolio securities to decline and as a result the Fund's asset coverage ratio has fallen below the 200% Level.

> If the 200% Level is not met on December 1, 2008, the Fund would have to postpone the payment of the previously declared November dividend and the declaration of the December dividend until

1    the situation is corrected. Depending on market conditions, this coverage

2    ratio may increase or decrease further. An announcement regarding

3    actual dividend payment and declaration dates will be made at a future

4    date.

5    64.    The other Funds did not issue similar releases on November 26, 2008, so

6 only the PCK Fund significantly dropped in price on that day, from $8.14 per share to

7 $6.36 per share. However, the other Funds would soon be affected.

8    65.    On December 1, 2008, a press release entitled "PIMCO Municipal Funds

9 Postpone Payment, Declaration of Dividends," was issued by PIMCO, which stated in

10 part:

11    PIMCO New York Municipal Income Fund, PIMCO Municipal Income

12    Fund II, PIMCO California Municipal Income Fund II, PIMCO

13    Municipal Income Fund III , PIMCO California Municipal Income Fund

14    III and PIMCO New York Municipal Income Fund III (each a "Fund"

15    and collectively, the "Funds") announced today that the Funds have

16    postponed the payment of the previously declared (November 3, 2008)

17    dividends on the Funds' common shares scheduled for payment on

18    December 1, 2008 and the declaration of the next dividends on the

19    Funds' common shares, which would have been paid on December 31,

20    2008.

21    Accordingly, the declared dividends ($0.057, $0.065, $0.07,

22    $0.07, $0.06 and $0.0525 per common share for PNF, PML, PCK, PMX,

23    PZC and PYN, respectively) payable on December 1, 2008 to

24    shareholders of record on November 13, 2008, with an ex-dividend date

25    of November 10, 2008, will not be paid on December 1, 2008.

26    Continued severe market dislocations and recent further erosions

27    in the municipal bond market have caused the values of the Funds'

28    portfolio securities to decline and as a result the Funds' asset coverage

ratios have fallen below the 200% Level (which is described below). A Fund is not permitted to pay or declare common share dividends unless the Fund's auction rate preferred shares ("ARPS") have a minimum asset coverage of 200% ("200% Level") after payment or declaration of the common share dividend, in accordance with the Investment Company Act of 1940, as amended, and the Fund's By-laws.

The Funds intend to resume paying and declaring dividends as soon as possible. The Funds may consider other options to resume paying and declaring dividends in the future, which may include redemption of a portion of the Funds' ARPS. An announcement regarding actual dividend payment and declaration dates will be made at a future date.

66. As a result of this news, the price of the Funds' shares collapsed. The PCK Fund's shares closed at $5.71 per share on December 1, 2008, an all-time low for the PCK Fund's shares and a decline of over 62% from its Class Period high of $15.18 on October 4, 2007. The PML Fund's shares closed at $5.91 per share on December 1, 2008, an all-time low for the PML Fund's shares and a decline of over 62% from its Class Period high of $15.38 on January 23, 2008. The PMX Fund's shares closed at $6.43 per share on December 1, 2008, an all-time low for the PMX Fund's shares and a decline of over 59% from its Class Period high of $15.58 on January 23, 2008. The PYN Fund's shares closed at $6.05 per share on December 1, 2008, an all-time low for the PYN Fund's shares and a decline of over 53% from its Class Period high of $13.13 on June 6, 2007. The PZC Fund's shares closed at $5.62 per share on December 1, 2008, an all-time low for the PZC Fund's shares and a decline of over 62% from its Class Period high of $14.71 on February 12, 2008.

67. The true facts, which were known by certain of the defendants but concealed from the investing public during the PIMCO II Class Period and/or PIMCO III Class Period, were as follows:

1          (a)     The Funds lacked effective controls and hedges to minimize the

2    risk of loss and risk of liquidity from ARS which affected a large part of their

3    portfolios;

4          (b)     The Funds lacked effective internal controls to ensure that the

5    Funds would remain in compliance with restrictions and limitations related to their

6    investment portfolios and strategies;

7          (c)     The extent of the Funds' liquidity risk due to the illiquid nature of

8    a large portion of the Funds' portfolios, including ARS, was omitted; and

9          (d)     The extent of the Funds' risk exposure to ARS was misstated.

10         68.     Analysts noted the PIMCO Funds had failed to reduce their exposure to

11   ARS. As *DowJones* report on December 1, 2008:

12              Declining net asset values have already forced some closed-end

13         funds leveraged with auction-rate preferred shares to delay dividend

14         payments or reduce their leverage to boost their asset coverage levels,

15         and more are expected to do so.

16              However, Cecilia Gondor, executive vice president at Thomas J.

17         Herzfeld Advisors Inc., a Miami investment-advisory firm, said the

18         Pimco dividend postponements are the first she's seen from municipal

19         closed-end funds. She noted that as some other fund companies moved

20         earlier this year to shed funds' auction-rate preferred share leverage

21         through the use of tender option bond programs, new auction-rate

22         preferred shares with put options or simply through "plain vanilla"

23         delevering, Pimco did not move to replace the shares right away.

24              "Pimco may have come into this correction in a somewhat worse

25         position than the funds that had taken some action early in the [auction-

26         rate preferred shares] crisis," she said.

27

28

## LOSS CAUSATION/ECONOMIC LOSS

69.    By misrepresenting the Funds' investing practices and the impact possible auction failures would have on the common shareholders, the defendants presented a misleading picture of the Funds' portfolio and financial prospects. Thus, instead of truthfully disclosing during the PIMCO II Class Period and/or PIMCO III Class Period that the Funds' portfolios were not as healthy as represented, defendants falsely reported the Funds' investing outlook and their actual financial prospects going forward.

70.    These false statements caused and maintained the artificial inflation in the Funds' share prices throughout the PIMCO II Class Period and/or PIMCO III Class Period and until the truth was revealed to the market.

71.    Defendants' false and misleading statements had the intended effect and caused the Funds' shares to trade at artificially inflated levels throughout the Class Period.  The PYN Fund reached its Class Period high of $13.13 per share in June 2007. The PCK Fund reached its Class Period high of $15.182 per share in October 2007.  The PML Fund reached its Class Period high of $15.38 per share in January 2008.  The PMX Fund reached its Class Period high of $15.58 per share in January 2008.  The PZC Fund reached its Class Period high of $14.71 per share in February 2008.

72.    The truth about the Funds' portfolios, investing outlook and financial prospects began to enter the market with a series of partial disclosures and revelations which were accompanied by denials and continuing misrepresentations by defendants. As a result, the artificial inflation in the Funds' shares prices did not come out of the shares all at once, rather the artificial price inflation came out over time, in bits, pieces, and spurts as the shares continued to trade at artificially inflated, albeit lower, prices through December 1, 2008.

73.   As a direct result of defendants' admissions and the public revelations regarding the truth about the Funds' portfolios, investing outlook and actual financial prospects going forward, the Funds' share prices plummeted 53%-62%.

## CLASS ACTION ALLEGATIONS

74.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired common shares of the Funds during the PIMCO II Class Period and/or PIMCO III Class Period.

75.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The Funds have tens of millions of shares outstanding, owned by hundreds if not thousands of persons.

76.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   whether the federal securities laws were violated by defendants;

(b)   whether statements made by defendants to the investing public during the PIMCO II Class Period and/or PIMCO III Class Period misrepresented material facts about the Funds;

(c)   whether defendants acted with the required state of mind;

(d)   whether defendants concealed the Funds' level of risk associated with their exposure to ARS and the attendant Funds' liquidity risk; and

(e)   the extent of damage sustained by Class members and the appropriate measure of damages.

77.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

78.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

80.     Plaintiff incorporates ¶¶1-79 by reference.

81.     During the PIMCO II Class Period and/or PIMCO III Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of common shares in the Funds during the PIMCO II Class Period and/or PIMCO III Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Funds' shares. Plaintiff and the Class would not have purchased the Funds' shares at the prices they

1  paid, or at all, if they had been aware that the market prices had been artificially and
2  falsely inflated by defendants' misleading statements.

3  ## COUNT II

4  **For Violation of §20(a) of the 1934 Act**
   **Against All Defendants**

5  84.  Plaintiff incorporates ¶¶1-83 by reference.

6  85.  The Individual Defendants and the Funds' Investment Manager and Sub-
7  Adviser acted as controlling persons of the Funds within the meaning of §20(a) of the
8  1934 Act.  By reason of their positions and relationship with the Company, the
9  Individual Defendants and the Funds' Investment Manager and Sub-Adviser had the
10  power and authority to cause the Funds to engage in the wrongful conduct complained
11  of herein.  The Funds controlled the Individual Defendants and all of their employees.
12  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

13  ## PRAYER FOR RELIEF

14  WHEREFORE, plaintiff prays for judgment as follows:

15  A.  Declaring this action to be a proper class action pursuant to Fed. R. Civ.
16  P. 23;

17  B.  Awarding plaintiff and the members of the Class damages, including
18  interest;

19  C.  Awarding rescission or a rescissory measure of damages;

20  D.  Awarding plaintiff's reasonable costs and attorneys' fees; and

21  E.  Awarding such equitable/injunctive or other relief as the Court may deem
22  just and proper.

23
24
25
26
27
28

- 27 -

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: March 31, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI

DAVID C. WALTON

655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

HOLZER, HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
JEFFREY A. BERENS
682 Grant Street
Denver, CO 80203-3507
Telephone: 303/861-1764
303/395-0393 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt PIMCO Muni Income Funds.doc

- 28 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized its filing.

2.     Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.     Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Fund | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| PIMCO FUND II (PGK) | 06-08-07 | 1,000 | 15.57 / 15,570 |
| PIMCO FUND II (PGK) | 06-11-07 | 1,000 | 15.58 / 15,580 |

Sales:

| Name of Fund | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| | | | |

5.     During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28TH day of MARCH, 2009 in _PASADENA____, _CA._____.
                                                        City              State

(Signature) X _Rene Parada_____

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENE PAROLA, Individually and On Behalf of All Others Similarly Situated **PLAINTIFF(S)** | **CASE NUMBER**<br><br>**SACV09-00386 SVW (JTLx)** |
| v.<br>PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, ALLIANZ GLOBAL INVESTORS FUND MANAGEMENT LLC, (See Attachment A) **DEFENDANT(S).** | **SUMMONS** |

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, __David C. Walton__, whose address is __Coughlin Stoia, et al., 655 West Broadway, Suite 1900, San Diego, CA 92101__. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __**MAR 3 1 2009**_____

By: ___A. DeAvila___
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    **SUMMONS**

ATTACHMENT A

Defendants (cont.)

WILLIAM H. GROSS, MOHAMED A. EL-ERIAN, BRIAN S. SHLISSEL, HANS W. KERTESS, LAWRENCE G. ALTADONNA, PAUL BELICA, ROBERT E. CONNOR, R. PETER SULLIVAN III, JOHN C. MANEY, WILLIAM B. OGDEN IV and MARK V. McCRAY

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
RENE PAROLA, Individually and On Behalf of All Others Similarly Situated

**DEFENDANTS**
PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, ALLIANZ
GLOBAL INVESTORS FUND MANAGEMENT LLC, WILLIAM H. GROSS
(See Attachment B)

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing
yourself, provide same.)
David C. Walton, Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058

**Attorneys** (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No    ☐ **MONEY DEMANDED IN COMPLAINT:** $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for Violation of the Federal Securities Laws. 15 U.S.C. §§78j(b) 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS — PERSONAL INJURY | TORTS — PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | PERSONAL PROPERTY | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## SACV09-00386 SVW (JTLx)

**FOR OFFICE USE ONLY:**  Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)    ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐    Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Pasadena | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐    Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date March 31, 2009

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## ATTACHMENT B

Defendants (cont.)

MOHAMED A. EL-ERIAN, BRIAN S. SHLISSEL, HANS W. KERTESS, LAWRENCE G. ALTADONNA, PAUL BELICA, ROBERT E. CONNOR, R. PETER SULLIVAN III, JOHN C. MANEY, WILLIAM B. OGDEN IV and MARK V. McCRAY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Stephen V. Wilson and the assigned discovery Magistrate Judge is Jennifer T. Lum.

The case number on all documents filed with the Court should read as follows:

### SACV09- 386 SVW (JTLx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

======================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY